Joi-iNsoN, Ch.
dissenting. I regret that circumstances which I could not control, prevented my hearing the entire argument in this cause at the hearing here, but having twice before heard it fully argued, first in the circuit court, and again in the Court of Appeals, I feel so fully possessed of all the questions involved, as to justify my expressing a decided opinion upon them ; and I should be satisfied simply to declare my adherence to the decree of the circuit court, but for the conviction that the judgment of this court inculcates principles at war with long settled and universally received rules of law, applicable to a wide range of contracts in general use, in relation to which I propose to add something to what is said in the circuit court decree.
The first question which I propose to consider- is, whether the sureties of Elliott are liable for the moneys received by him under the order of the court of November, 1823, directing “that all the outstanding debts due to the estate of Dr. M’Leod, be placed in the hands of the Commssioner for collection by suit or otherwise,” and under the order of the 1st March, 1823, directing “ that the Commissioner do receive all the papers and money of the estate” (of Robert A. Darby,) “ into his hands, he giving the administratrix a receipt for the same : and that he be directed to place the money at interest, and when the claims in dispute are disposed of, to make a division among the creditors.”
It has not and will not be questioned, that according to the practice in the English Chancery Courts, the duties required of Elliott by these orders properly belonged to a receiver, who is not now, and never was, a standing officer of the court, but a person standing indifferent between the parties, appointed by the court to take the possession and management of lands and other things in controversy, pending the suit, where it was improper to trust either of the parties with it. Here the assets of the estates were taken out of the hands of the executor in one case, and the administratrix in the other, and put into the hands of the Commissioner to be administered, which was unauthorized unless they were unfit to retain them, and ought, then, according to the English practice, to have been put in the hands of a receiver. But I am willing to concede that, under the usage which universally prevailed before the Act of 1821, 7 Stat. 323, *181 these duties were properly assignable to the Master or Commissioner of the Court, and appertained to the duties of his office, and that his sureties would have been liable for any defalcation in the execution of them. If, however, I have not grossly misinterpreted that Act, it was intended to reform that practice. It provides, “ that whenever hereafter the Master or Commissioner in Equity in this State shall be appointed a receiver of the Court of Equity, and shall accept such appointment, he shall, before he enters upon the duties of such office, duly execute a bond to the Judges of the Court of Equity, with two or more good and sufficient sureties, to be approved of by the court making the order, in a sum equal to twice the value of the estate and effects intrusted to him, conditioned for the faithful performance of his duty as receiver, which bond shall be kept among the records of the Court of Equity, and also recorded by the Register, in a book to be kept for that purpose in every court; and a copy of said bond, certified by said Register, shall be delivered by him, on demand, to every party interested in said funds; and such party, or parties, is and are hereby authorized to institute a suit at law on such certified copy.” (fee.
Before the passage of this Act, the Master and Commissioners of the court were, under the usage before refered to, habitually appointed by the court to do the duties required of a receiver, in cases where it was necessary and where another suitable person could not be conveniently obtained, without requiring the security provided for in the Act. But the case under consideration furnishes two examples in which a Commissioner has been appointed to discharge these duties, without having been required to give the security, and there are doubtless many others, and it has been insisted, in the discussion of this case, that the Act did not divest the court of the authority to appoint the Commissioner receiver .under the usage as before, and that the security required was intended to be in aid of the official bond, and that consequently the Commissioner, in that character, was bound to obey the order of the court.
I do not know how to meet this argument better than by re-fering to the terms of the Act itself. Before that, the Commissioner had been required to perform the duties of receiver without giving security, and the Act, if it means any thing, provides that he shall no longer perform these duties without giving the security. That if he shall accept such “appointment” ! — not the office of Commissioner, but of receiver, — “ he shall, *182 before he enters upon the duties of such office” (not of Commissioner but of receiver,) “duly execute a bond” <fec., and if the legislature had intended to declare that the Commissioner should no longer discharge the duties of receiver, I am at a loss for language that would more clearly express the idea, qualified only by the condition that he should give bond and security.
The fact that the court made the orders under which Elliott took possession of the assets, is relied on, as refering these duties to his office of Commissioner of the court, and therefore his sureties are liable.
I have before shewn, that the Legislature has declared that they shall not appertain to that office, and that they properly appertain to the office of receiver; and although the orders under which he acted do not entitle him receiver, the omission to do so neither imposes on him the duty, or authorizes him to act in that character, without giving the security. Any other construction would operate as a repeal of the Act. Leave out the title of receiver, and according to the construction contended for, you may impose on the Master or Commissioner all the duties of receiver.
But it has been said, that the act has been done under the authority of the court, and it has been asked in argument, whether the parties will be permitted to suffer loss by these means, and I fear that in our sympathy for suffering suitors, we have lost sight of the rights of Elliott’s sureties. But I will ask in reply, whose fault is it that such orders were made ? Will any one who has examined the Act, believe that any Chancellor who ever presided on this or any other bench would have made such orders without requiring security, if it had been asked by any one of the parties or their solicitors ? It is too clear to admit of a question, and the necessary inference is, that they were made by the assent of the parties. That ought not to be permitted to operate as a wrong to Elliott’s sureties.
The history of the Act of 1821, alluded to in the circuit court decree, has been refered to, as furnishing a clue to the interpretation of the Act, and parts of several of the subsequent clauses have been relied on as shewing that, under the usage of the court, the commissions of the Master or Commissioner were doubled or trebled, in passing through the hands of a receiver, instead of the Commissioner or Master, and the Act was mainly intended to correct the abuse of their powers over the subject. I concede in extenso the rule, that to ascertain the true meaning *183 of an Act of the Legislature, it is admissible to look into the history of the times at which it was passed, to ascertain the evils that were intended to be remedied, and to examine into not only all the clauses of the same Act, but all other Acts on the same subject, and to read them as one Act. But that is only admissible where the terms employed are of doubtful import, or where the provisions of the same Act are inconsistent, and never can be resorted to to contravene a plain and positive enactment. Does any one doubt what the Legislature meant when they said that no “Master or Commissioner in Equity shall be appointed a receiver,” without giving bond and security 7 No ! that would control the usage, and-you look in vain through this Act to find any thing inconsistent with it.
I come now to the consideration of a question which I regard of much more importance, because its decision is calculated to operate not only upon the particular case, but upon a numerous class of contracts. It is, whether the sureties of Elliott are liable for the money received by him on Dr. Whit-ridge’s bond.
The most prominent condition of Elliot’s official bond is, that he shall faithfully discharge the duties of the office of Commissioner in Equity, during his continuance in office. The duties to be discharged are those which appertain to the office, as prescribed by positive enactments of the Legislature, and the usages of the court. Amongst them, and immediately applicable to this question, the Act of 1821, befor-e refered to, requires that he should deliver over to his successor “all the papers and documents appertaining to his office, together with all the moneys, bonds, notes,” <fcc. “ within twenty days after the date of the commission of such successor.” Dr. Whitridge’s bond certainly appertained to the office of Commissioner, and was in the possession of Elliott at the time his office expired. He neglected to deliver it over to his successor within the time prescribed by the Act, and I concede, at once, that this was a defalcation for which his sureties were responsible. But the question-arises, what injury did the legatees of Dr. M’Leod sustain by this neglect'? If the sureties had been immediately sued on their bond, they, the plaintiffs, might have been compelled to submit the condition to a jury to ascertain the damages, and if the sureties had held up the bond in court ready to be delivered to the plaintiffs, or had furnished evidence of its existence, and pointed out the way of recovering the amount', what jury would *184 have given more than nominal damages against the sureties 1 Suppose the bond unpaid, and the sureties, even now, sued upon Elliott’s official bond, and, on submitting the condition to a jury, they were able to shew that Dr. Whitridge was abundantly able to pay his bond, and that, notwithstanding the great delay, there was no obstruction to a recovery against him, would the jury, in the wide discretion which they are entitled to exercise in questions of damages, find against them the whole amount of Dr. Whitridge’s indebtedness to the estate of M’Leod, still leaving the legatees to recover the same amount from him, with interest on both sums from the time the b ond was due ? And yet this court, in the exercise of Chancery powers, are, we are told, authorized to sit in judgment to ascertain the damages, admitting no claims to mitigation.
But it has been said, that this bond has been paid to Elliott, and therefore his sureties are liable. That was after the expiration of his term of office, and the authority to receive it cannot be traced to any connexion with his duties while in office. It is true, that the bond was made payable, in the usual form, to him and his successors in office, but these terms, - in themselves, as well as the nature of the transaction, point to the successor as the person entitled to receive the money after Elliott went out of office. And again it is said, that his possession of the bond after he went out of office, authorized Whitridge to pay him the money; and cases have been referred to, to shew that possession of a bond- or note is prima facie evidence of authority to receive the contents. Take that for all it is worth— no case can be found in which it has been even surmised that a debtor would be protected in paying money due on a bond or note, to one whom he knew was not entitled to receive it, although he might be in possession of the bond or note. Now, the Act of 1821 is a public Act, which every one is bound to know, nor will ignorance of it be received even as an extenuation. That Act required that Elliott should turn over the bond ‘to his successor within a limited time, indicating, as clearly as language can, that his power over it, and his right to receive the money, were at an end ; and in legal eifect operated as a notice to Dr. Whitridge, as effectually as if the whole Act had been stamped on the bond in capital letters. The true question then, is, whether the sureties, who were not in the way to know, and will not be presumed to know, that Elliott had the bond in his possession, or Dr. Whitridge, who paid the money to him, *185 knowing that he had no authority to receive it, shall lose the money.
I have before remarked, that Elliott’s receipt of the money could not be traced to any connexion with his duties during his continuance in office. His office ended, and his liability attached, when he neglected to deliver over Whitridge’s bond to his successor within the time prescribed by the Act; and it will be difficult to find any principle or dictum by which his sureties would be held liable for any act done by him afterwards. He had ceased to be commissioner, and was acting sui juris, and if in this case the Act be referred to his powers as commissioner, he might, if alive, go on and execute every order of the court made during his continuance in office. If such a principle be established, the sheriffs of the various districts in the State might go on after the termination of their offices, and enforce and collect the executions in their offices, on the responsibilities of their sureties; and so of clerks, ordinaries, guardians and others acting in a fiduciary character, who are required to give bond and security for the faithful discharge of their duties. Having once assumed their offices or duties, their sureties would remain liable in all time, for any act they may have done or omitted, under color of their power or authority ; notwithstanding their offices had terminated, or their trusts had been discharged. On this point, I may rely with confidence on the judgment of the court, as to the liability of Elliott’s sureties, for the proceeds of the sale of Folly Island, under the order of the court in ex parte Mary S. Darby et al. That order was made whilst Elliott remained in office ; and because he sold the Island afterwards, and without authority, it is held that his sureties are not liable for the money received ; and I confess that I am utterly unable to distinguish between the cases.
It is now received as a maxim, that sureties are favored in all matters of doubtful right. I agree, that generally, they are not discharged by the mere passive neglect of the creditor to enforce his rights against their principal; yet, there are numerous instances in which active diligence is required, of which the Law merchant furnishes some examples. According to that, the holder of a bill of exchange, or promissory note, must demand payment, and if it is dishonored, give notice to the indorser, who stands in the relation of surety, within a limited time, to entitle him to recover against the indorser; and I am much inclined to think, that a rule founded on the same principle might *186 be usefully applied to cases like the present. Here the legatees of M'Leod must have known that Elliott had possession, of the bond of Dr. Whitridge, for they were' parties to the proceeding. They might have compelled him to turn it over to his successor, upon a rule to shew cause, or recovered it in an action of deti-nue. The sureties, as before remarked, were not in a situation to- know that such a bond existed, nor had they any clue by which to direct their enquiries in relation to it. Elliott might have concealed it from them, in despite of all their enquiries, and it would have been impertinent in them to file a bill for a discovery, on the mere supposition that he had violated -the duties oí his office, and thereby exposed them to loss; and now, after a lapse of near twenty years, when all hope of their being reimbursed is lost, they are called on to pay a large sum, which, if lost at all, has been lost by the negligence of the parties claiming.
Johnston, Ch. and Butler and Frost, JJ. concurred in so much of this opinion as declares that the sureties of Elliott are not liable for the money which he received on Dr. Whitridge’s bond.